Filed 5/7/15  C.P. v. Super. Ct. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| C. P. et al, <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF SANTA CRUZ, <br><br> Respondent, <br><br> SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT, <br><br> Real Party in Interest. | No. H041924 <br> (Santa Cruz County <br> Super. Ct. Nos. DP001547, DP001548, DP002379) |

I.P. (a 15-year-old girl), E.N. (a 10-year-old boy), and N.L. (a 7-year-old girl) (collectively, the minors) are the three children of C.P. (Mother).  The minors were placed in protective custody on October 29, 2014.  At the time, there was a pending investigation concerning alleged physical abuse of E.N. by Mother and J.L., Mother's ex-boyfriend and the presumed father of N.L.  After the minors were placed in protective custody, the Santa Cruz County Human Services Department (Department) filed three juvenile dependency petitions on behalf of the minors under Welfare and Institutions

Code section 300.[1]  The Department alleged (1) the minors had suffered, or there was a substantial risk they would suffer, serious physical harm inflicted upon them by Mother and J.L. (§ 300, subd. (a)); (2) Mother and J.L. had failed to protect the minors (§ 300, subd. (b)); (3) the minors had been sexually abused or there was a substantial risk they would be sexually abused by J.L. (§ 300, subd. (d)) (§ 300, subd. (d)); and (4) I.P. and E.N. had been left without any provision for support by their respective alleged fathers, the whereabouts of whom were unknown (§ 300, subd. (g)).  Detention of the minors was prompted by incidents alleged to have occurred on or about October 20, 2014, in which J.L. had struck I.P. in the face and later that evening while I.P. was sleeping on a couch, had sexually abused her, causing I.P. to sustain injuries.  The Department also alleged that Mother and J.L. had failed to ameliorate problems that had resulted in the initiation of two prior dependency proceedings in 2006 and 2010.

After a contested jurisdictional/dispositional hearing concluding on January 30, 2015, the court found the allegations true and sustained each petition.  In its jurisdictional/dispositional order for each case (collectively, the Order), the court found by clear and convincing evidence pursuant to section 361.5, subdivision (b)(6) (hereafter, § 361.5(b)(6)) that reunification services should not be provided to Mother or J.L. based upon J.L.'s severe sexual abuse of I.P.  The court also set a selection and implementation hearing under section 366.26 (hereafter, sometimes referred to as a .26 hearing or permanency hearing) for May 19, 2015.

Petitioners Mother and J.L. seek a writ of mandate to compel the court to vacate its Order.  Mother challenges the court's denial of her reunification services as to the three minors, and J.L. challenges the denial of his reunification services as to N.L.  Mother and J.L. also seek an order staying the permanency hearings.  They contend the

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

court erred because there was no substantial evidence supporting its findings that (1) the alleged actions of J.L. toward I.P. constituted severe sexual abuse, and (2) Mother impliedly consented to J.L.'s severe sexual abuse of I.P.

We conclude that respondent court did not commit error in denying reunification services to Mother and J.L. Accordingly, we will deny the petitions and deny the requests to stay the permanency hearings.

FACTS AND PROCEDURAL HISTORY

I.  *Initial October 2014 Petitions and Detention Orders*

On October 28, 2014, the Department filed three separate petitions alleging that the minors came within the jurisdiction of the juvenile court pursuant to subdivisions (a), (b), and (d) of section 300. In the petitions concerning I.P. and E.N., the Department also alleged that subdivision (g) of section 300 applied. The Department alleged,[2] among other things, that J.L. physically disciplined the minors by striking I.P. and E.N., and as recently as October 20, 2014, had struck I.P. in the face and caused her to sustain injuries. J.L. had also "sexually abused [I.P.], including grabbing her breasts, and touching her buttocks and vagina. The child sustained injuries due to the abuse and her struggle to get away from [J.L.]." Mother also physically disciplined the minors by throwing objects at them, hitting E.N. with a spoon, and pulling I.P.'s hair.

At the jurisdictional/dispositional hearing on January 30, 2015, discussed in detail, *post*, the court on its own motion amended the petitions to conform to proof. The amendments concerned the allegations under subdivision (d) of section 300, and consisted of additional allegations that (1) J.L.'s conduct constituted severe sexual abuse within the meaning of section 361.5(b)(6); (2) Mother failed to protect the minors from

_____

[2] The statements made in this paragraph and in the succeeding paragraphs of this section are based upon the allegations made by the Department in its three petitions. For simplicity and to avoid repetition, we have generally omitted the phrase "the Department alleges in its petitions" in describing the allegations in the petitions.

3

such sexual abuse; (3) Mother knew or reasonably should have known the minors were in danger of sexual abuse; and (4) Mother's conduct constituted severe sexual abuse within the meaning of section 361.5(b)(6).

Social Worker Tierney Long interviewed I.P. at her school on October 24, 2014, along with Santa Cruz Deputy Sheriff Jeff Simpson. Long was also present for a separate interview of I.P. by Detective Matthew Pursley on the same day. I.P. reported that one week earlier, on October 17, 2014, while Mother was at work, J.L. had gotten very angry with I.P. because her boyfriend had come over while she was watching her younger siblings. J.L. slapped I.P.'s cheek; she reported that the slap did not leave a mark. E.N. was present when this occurred. J.L. then took away I.P.'s cell phone, texted I.P.'s boyfriend pretending to be I.P., and later terminated service to the phone. He also took away I.P.'s makeup and hair straightener.

Later the same evening, I.P. was sleeping on the couch. She did not want to sleep in the bedroom—typically shared by Mother, J.L., and the three minors—because J.L. had been so angry with her. She was wearing a shirt, undershirt, and sweatpants. She awakened around midnight when J.L. lay down beside her. She reported that J.L. "had cuddled her about 5 times before and she said this was ok." He held her for about five minutes while she pretended to be asleep. J.L. then put his hands under her shirt and under her bra "and was 'grabbing her really hard.' He grabbed her 'whole boob.'" "[I.P.] said that 'he put his hands where they shouldn't be.' He put his hand under her shorts and touched her rear area and her vagina." I.P. said that J.L. had "touch[ed] her vagina for 1 second and then he stopped because she was struggling and crying." She indicated she was "afraid J.L. would have penetrated her vagina with his finger if she had not moved." According to I.P., J.L. "finally stopped because she was struggling and crying." The incident lasted approximately 10 to 20 minutes. Long asked I.P. whether anything like this had happened before; "[I.P.] said[,] never." I.P.'s arm sustained a scratch from J.L.'s fingernail when she struggled to get away from him. I.P. also said that

4

her breast was sore from J.L.'s having grabbed it. I.P did not tell her Mother about the incident "because she was afraid . . . [Mother] would 'freak out.' " I.P. said she did not feel safe going home.

Deputy Simpson asked I.P. how she had sustained a "scar above the corner of her right side of her mouth." I.P. reported that on October 20, J.L. became very angry because he thought I.P had taken E.N.'s iPod. J.L. "slapped her hard on the face twice and she bled . . . inside her mouth." (I.P. wore braces at the time.) She said she had not taken the iPod and later helped her brother locate it in a closet. I.P. said that "[h]er mouth was sore and swollen to the point that she could not eat or talk properly."

I.P. also said that on October 21, J.L. "had a belt in his hand and he warned [I.P.] that she 'better not be acting like this.' " On the same day, I.P. told Mother she did not want to go home because she was afraid of J.L. I.P. reported that Mother told J.L. "to 'stop hitting the kids because they will get taken again.' " Mother also "told I.P. not to say anything because social workers would come talk to them and take them away from home." I.P. also told Deputy Simpson and Long that J.L. " 'mostly hits my brother.' " She said J.L. strikes E.N. "hard enough to make him cry." And she said that J.L. pinches E.N., leaving bruises. I.P. indicated that "[J.L.] manipulates people. [She] said that she would not feel safe going home now. Her mom is not safe either[;] 'she is scared of him.' "

Long performed a follow-up interview with I.P. on October 27, 2014. I.P. told Long that Mother was present on the prior occasions when J.L. had cuddled her while they were in the living room. I.P. confirmed that she slept in a bed with her sister (N.L.) and J.L., and that Mother slept alone in the same room. Long "asked if she ever got uncomfortable sleeping next to [J.L.] and she said ['] yes ['] a few times 'he got really close to me,' so she went to sleep on the sofa. [I.P.] said that . . . [in 2014, J.L. began to] lay behind her and hold her tighter." I.P. also told Long that J.L. " 'mostly pinches [E.N.] or smacks him on the head or shoulder,' " and that he did so "once a week or once a day."

5

She mentioned an incident in which J.L. had pinched E.N. hard, and she had told E.N. to put ice on the injury. She also said that J.L. had slapped her approximately four times in the past two years.

Long interviewed E.N. on October 27, 2014. E.N. told her that " '[J.L.] yells at [him] and sometimes hits [him] really hard.' He hits him on the arm with an open hand. [J.L.] also knocks him on the head" and pinches him. On at least one occasion, the pinching left a bruise. E.N. confirmed that J.L. had slapped I.P. in the face. He told Long that "[h]e slaps her super hard." E.N. reported that "when [J.L.] 'stopped hitting mom he started hitting [the] kids more."

In an interview on the same day, N.L. told Long that J.L. had struck I.P. in the face because she had lied to him. "[N.L.] said that she was pretending to be watching [television] because she was scared." N.L. said I.P. was bleeding afterward.

Long interviewed Mother on October 27, 2014. Mother indicated she was aware that I.P. had reported to her teacher that she had been sexually abused by J.L. Mother asked Long why her two younger children were in protective custody. Long explained there had been an allegation of physical abuse, and that it had been alleged that J.L. had hit and pinched E.N., resulting in E.N. being bruised. Mother denied that the minors were physically abused and said E.N. had fallen many times, which explained any bruising. Mother admitted that J.L. had slapped I.P. on October 20, although Mother said she had not observed it.

Long asked Mother if she were concerned about leaving the minors in the care of J.L. because of his history of violence with both her and the minors. Mother responded that she was not concerned because "he is a changed man." Long asked Mother about I.P.'s allegation that J.L. had sexually molested her. Mother responded, " 'I have no idea why she said he touched her.' " Mother said she did not know why I.P. would be afraid to tell her about the molestation. Long told Mother it was "concerning that she [did] not believe her daughter. [M]other said that she [believed I.P.], but she [did] not want to pick

6

sides between [I.P.] and [J.L.]. She said that if [J.L. were] convicted then she will know it [was] true but for now she [did not] want to side with her daughter if her daughter is telling lies."

Mother told Long that she and J.L. were no longer in a relationship, and that she had had another boyfriend for two and one-half years. Mother indicated that J.L. did not live with her. Mother told Long that she did not know where J.L. lived, but that he still slept in the home two or three nights a week. Long asked Mother about the sleeping arrangements. Mother indicated that J.L. slept in the same bed with I.P. and N.L., and that Mother slept alone.

There were two prior dependency proceedings. During the two prior proceedings, Mother and J.L. received family maintenance services from 2006 to 2008 and from 2010 to 2013. The family maintenance services included counseling, domestic violence services, and parenting education.

On October 29, 2014, the court ordered the minors detained pursuant to section 319, subdivision (b), with temporary care and custody vested with the Department. The court ordered visitation with all three minors for Mother and visitation with N.L. for Father.

II.    *Jurisdictional/Dispositional Hearing Report*

The Department filed its jurisdictional/dispositional hearing report in the three cases on December 16, 2014. The Department repeated the allegations in the initial petitions concerning Mother and J.L., but also included substantial new material.

A.    Interviews

Social Worker Long visited E.N. and N.L. at Del Mar Elementary School on November 13, 2014. E.N. told Long he was doing well in his foster home placement. He asked when he would be able to go home to Mother. Long told E.N. she was working on getting family friends approved for placement, and E.N. said he would be " '[p]retty

7

happy' " if he was able to stay with them. N.L. said she was doing well in her placement. She told Long that "she wanted to ask her parents if they loved her and her siblings."

Long met with I.P. at Watsonville High School on November 17, 2014, which was her first day at the school. (A few days earlier, I.P. had indicated to Long that she "kept having anxiety attacks" and was fearful that J.L. would unexpectedly show up at her high school; she therefore asked to transfer to another school.) I.P. said she did not want to have visits with Mother "because she felt that her mother was mad at her. She stated that her mother always ha[d] a sarcastic tone when she talk[ed] on the phone. [I.P.] stated that her mother had not yet given her any of her clothing or personal belongings." I.P. also told Long that "she wanted to share more of what had been going on under her mother's care. She stated that her mother [was] physically abusive to her and [E.N.]. She stated that her mother [was] often frustrated when she [came] home from work and [would] hit [E.N.]. She explained that her mother pull[ed E.N.'s] hair and ears. [I.P.] stated that the last time her mother hit her was [sometime in 2013] when [I.P. had] got[ten] home late. Her mother [had] pulled her hair, slapped her and threw her to the ground. She shared that [J.L. was] highly abusive with [E.N.] and he hit[] him on a regular basis. [J.L.] hit[] him on the mouth sometimes. He also pinche[d] him hard on the arms." I.P. also told Long that Mother's statement that J.L. was not living in the home was untrue and that he still had all of his belongings there. I.P. further said to Long: " 'I don't want to go back to my mom. I'm scared it will happen again. I like living in Watsonville with [my foster parents]. I don't think my mother can keep me safe. She works a lot and I have to take care of the kids.' "

During an interview on November 14, 2014, Mother told Long "that she has to believe that [I.P.] is telling the truth. She stated that she trusted [J.L.] and never thought that he would be sexually inappropriate with [I.P.]." Mother said she has a close relationship with I.P. She said J.L. was not living in the home, but he helped take care of the children because she worked two jobs and went to night school. Mother indicated

8

that J.L. usually left when she came home at night, but he sometimes stayed the night. She said the entire family slept in the same room.

Mother explained that J.L. liked sleeping with I.P. and N.L., with him sleeping between the two girls. Long asked whether she felt comfortable with I.P. and J.L. sleeping in the same bed; Mother said that she did not. Mother explained to Long that she had asked J.L. why he slept in the same bed with I.P. and N.L. He told Mother "that as long as he was around he was going to continue sleeping with them." Long asked Mother if "she had any concerns about [J.L.'s] close relationship with [I.P.] and [M]other said ['] yes.['] She stated that she thought it was odd that he was buying [I.P.] undergarments from Victoria's Secret." J.L. also kept track of I.P.'s menstrual cycle, bought her tampons, and had bought pregnancy tests for her on two occasions when her menstrual period was late.

Long attempted to arrange an interview with J.L. J.L.'s attorney indicated to Long that she wanted to be present. Long proposed dates and times to J.L.'s attorney, but she did not hear back from her.

The Department noted in its report that it had provided 18 months of family maintenance services to Mother from June 2006 to March 2008 and an additional 30 months of services from November 2010 to August 2013. The Department had also referred Mother to the Parents Center for counseling; referred J.L. to the Parents Center for counseling and parenting classes; met with Mother and the minors; referred the minors to Children's Mental Health for an assessment; and provided visitation for Mother with the minors.

### B. Interviews with Law Enforcement

The Department in its report attached several crime/incident reports generated by the Santa Cruz County Sheriff's Office. The reports were based upon interviews of I.P., Mother, and J.L.

Deputy Simpson reported on his interview with I.P. that occurred on October 24, 2014. The substance of what I.P. reported concerning J.L.'s sexual abuse of her on October 17 was consistent with what Long had recited in the petition about the sexual abuse. On October 26, 2014, Detective Matthew Pursley conducted a follow-up interview with I.P. and summarized it in a report. I.P. recounted J.L.'s actions on October 17. She indicated that (1) J.L. lay down beside her on the couch while she was sleeping; (2) he "cuddled" her for approximately five minutes with his left hand and arm under her left side and his right arm over her right side; (3) he moved his left hand under I.P.'s shirt and bra and placed his hand on her left breast; (4) he grabbed her breast " 'really hard' " for approximately three minutes (although she was not sure of the precise amount of time because "she was crying and trying to get away"); (5) J.L. then moved his hand down toward I.P.'s waist, pushed his right hand under her pants, shorts, and underwear, and placed his hand over the top of her vagina; (6) because she was moving, J.L.'s "hand was only on her vagina for a brief second"; (7) I.P. felt that had she not been struggling, J.L.'s fingers would have penetrated her vagina; (8) I.P. continued to cry, and J.L. told her to go into the bedroom; and (9) J.L. then went to work.

Deputy Simpson interviewed Mother on October 24, 2014. After he told her he had been informed of past allegations that J.L. had abused the minors, Mother said she had no knowledge of J.L. physically or sexually abusing the minors in the past few months. She said all three minors got along with J.L. Mother said she worked during the day and J.L. babysat the minors. She told Deputy Simpson that J.L. "was her ex and the father of [N.L.]," and that he did not live with her and she did not know where he lived.

J.L. was interviewed by Detective Roy Morales of the Santa Cruz County Sheriff's Office on October 24, 2014. J.L. said that on October 18, after he had had an argument with I.P. about her having a boyfriend over to the house without permission, he fell asleep on a couch in the living room. He awoke to hear I.P. crying. J.L. told Detective Morales that "[h]e asked her why she had lied about having someone over, as he lay next to her on

the couch. He . . . plac[ed] his arms under [I.P.'s] body as he asked her why she was crying. He told Detective Morales that he held [her] tightly and she would not have been able to shake loose from his hug. . . . [I.P. told] him to leave her alone. [J.L.] placed his hand under her shirt, skin to skin and closed his eyes." J.L., in response to Detective Morales's questioning, said it was possible that his hand had touched I.P.'s breast while he was hugging her. J.L. denied that he had grabbed her breast in a forcible manner. And he denied I.P.'s accusation that he had placed his hand on top of her vagina.

### C. Prior Proceedings and Referrals

In its report, the Department discussed two prior dependency proceedings and other child welfare referrals in Santa Cruz County relating to Mother. In September 2005, the Department received a referral of alleged emotional abuse of I.P. and E.N. by Mother and by E.N.'s father, G.N. It was alleged that G.N. had attempted to rape Mother while she was holding E.N. (then age one). G.N. pulled Mother's head, jerking it back and forth. I.P. was in another room and did not witness the incident. I.P. told the Department she was afraid G.N. would hurt them. Mother reported that previously, in the summer of 2005, G.N. had kidnapped her, drove her into the country, and threatened her with an ice pick. G.N. was arrested, law enforcement issued an emergency protective order, and Mother was provided with domestic violence services and signed a contract in which she agreed to protect her children and avoid contact with G.N.

The first dependency proceeding spanned from June 9, 2006, to March 4, 2008. On June 9, 2006, the Department received a referral involving alleged physical abuse of I.P. and E.N. It was alleged that E.N. (then age two) had twice exhibited suspicious bruises on his face. The reporting party stated that Mother's boyfriend, J.L., had been taking care of E.N. and had indicated E.N. had fallen. It was reported that Mother had "told someone, '[I]f you say something [about the bruising], I will blame you.' " Domestic violence was also reportedly occurring in the home. J.L. denied that he had struck E.N., but admitted to having spanked him in the past. Mother also denied that J.L.

11

had ever struck E.N., but she admitted that he had spanked him "on his bottom." I.P. and E.N. were declared dependents as a result of the reported physical abuse, and it was further alleged there was a substantial risk of physical abuse of I.P and E.N. by Mother and J.L.

While the first dependency proceeding was pending, the Department, on August 2, 2007, received a report involving an alleged substantial risk of emotional abuse of I.P., E.N., and N.L. by Mother's boyfriend, J.L. Mother and J.L. had had an argument because J.L. wanted to take the baby, N.L. (then seven weeks old), out of the home all night. J.L. "bent back [M]other's hand to get her to release the baby, but [she] did not release her." The three minors were present in the home at the time. J.L. left, but later returned. He "was reported to be very controlling and threatened [M]other with taking [N.L.] to Mexico."

A period of 18 months of family services were offered to Mother during the first dependency proceeding. The case was dismissed on March 4, 2008, after the Department determined that Mother had made significant progress with therapy and domestic violence education and had learned and had applied new parenting skills.

The second dependency proceeding spanned from November 1, 2010, to September 9, 2013. "The Department received a referral alleging emotional abuse of [N.L.] by her father, [J.L.], and general neglect of [the minors] by [Mother]." The precipitating event occurred on October 30, 2010. On that date, J.L. accused Mother of cheating on him, and he placed a belt around her neck and tightened it. He held it tight for a minute. J.L. then cinched the belt tight around Mother's neck a second time. Mother did not lose consciousness, but found it difficult to breathe, and she sustained red marks on her neck. The youngest child, N.L. (then three), witnessed part of the incident. Mother called 911, and reported that J.L. had choked her for approximately five minutes. J.L. was arrested, and Mother received an emergency protective order. The three minors were declared dependents as a result of J.L.'s physical abuse of them and because of

Mother's failure to protect the minors from physical abuse and exposure to domestic violence.

As part of the second dependency proceeding, the social worker interviewed Mother and provided some education about domestic violence. Mother was cooperative but not fully focused on the conversation, often looking at her cell phone for incoming text messages. "When informed about the referral possibility being arraigned in Court, [Mother] sarcastically stated, 'What are they going to have me do, the domestic violence classes again[?]' "

While the second dependency proceeding was pending, the Department received four reports of alleged physical abuse. The first report dated November 22, 2010, involved alleged physical abuse of I.P. by Mother. It was reported that Mother had slapped I.P in the face because she had refused to dance with Mother at a social event; the blow left a mark on the girl's cheek.

On January 31, 2011, the Department received a second report of alleged physical abuse of E.N. (then seven) by Mother. According to the report, Mother had been mad at E.N. for not having gotten ready for school and for not having had his belt fastened. Mother reportedly struck E.N. with a shoe on his back, chest and legs. No bruises on the boy were found. "[E.N.] indicate[d] that his mother disciplines him this way a lot."

On March 8, 2012, the Department received a third report of alleged physical and verbal abuse of E.N. by his father, G.N. The reporting party also said that Mother had advised that G.N. was physically and verbally abusive to her and to I.P. It was reported that G.N. struck E.N. hard on the head and locked him in a closet to punish him. I.P. and E.N. also witnessed domestic violence perpetrated on Mother by G.N.

On June 29, 2012, the Department received a fourth report of alleged physical abuse of the three minors by Mother. E.N. told a mandated reporter, " 'I don't want to go home[. M]y mom hits me all the time. She hits me more than my sisters.' " Both I.P. and E.N. disclosed to the Department that they had been physically abused by Mother,

13

but neither exhibited noticeable injuries.  I.P. said that she "wish[ed] . . . there 'would be no more hitting in the house.' "

The second dependency proceeding terminated September 9, 2013.  The Department had provided 30 months of family maintenance services during that proceeding.  At the time the case was closed, J.L. was no longer living with Mother and the minors.

There were two reports of alleged physical abuse to the Department after the second dependency proceeding terminated and prior to the initiation of the third proceeding.  On January 13, 2014, the Department received a report of physical abuse and neglect of I.P. by Mother.  I.P. reported that she had had a male friend over to the house without Mother's permission.  When Mother's boyfriend[3] got home, he asked the boy to leave and then informed Mother when she arrived.  Mother began yelling at I.P. and threw a shoe at her, striking her on the shoulder.  Mother's boyfriend took I.P.'s cell phone and posted items on Facebook under I.P.'s name that made her friends so upset, they came to the "house to beat her up.  When [Mother] found out that some girls wanted to beat up [I.P., Mother] told [I.P.] that she deserved 'to get her ass kicked.' "  I.P. also reported that Mother and her boyfriend regularly went out at night and left I.P. in charge of her two siblings.  Mother would return in the early hours of the morning, or sometimes would not come home at all.

On October 13, 2014, the Department received a report of alleged physical abuse of E.N. by Mother and J.L.  A mandated reporter advised the Department that E.N. had been having trouble at school, and he had said that J.L. "yells a lot and hits [E.N.] with an open hand on the back and bottom."  E.N. said this happened frequently with J.L. and "a little" with Mother.

---

[3] Although it is not specifically indicated in this portion of the report, it appears the references to Mother's "boyfriend" are to J.L.

14

### D. Criminal History and Paternity

The Department reported that Mother had no known criminal history. It indicated that J.L.'s criminal history between June 2008 and October 2010 consisted of driving without a license, manufacturing false government documents, providing false citizen documents, forcible assault with a deadly weapon, and infliction of corporal injury on a spouse or cohabitant. J.L. was arrested on November 19, 2014, and charged with commission of a lewd act on a child 14 or 15 years old and more than 10 years younger than the defendant (Pen. Code, § 288, subd. (c)(1)). The preliminary examination was scheduled for December 15, 2014.

I.P.'s father, J.G., was never married to Mother. According to Mother, he was never part of I.P.'s life. J.G.'s whereabouts were unknown. Mother also reported that she did not know the whereabouts of E.N.'s father, G.N. Mother left G.N. in 2005 because of domestic violence, and she had had no contact with him since that time.[4]

### E. Placement

I.P. and N.L. were living with one foster family and were reported to be doing well in their placement. E.N. was living with a family friend and was reported to be doing better in that placement than he had with his initial foster care placement. The Department reported that it did not appear that placement of the minors with any relatives would be feasible.

As far as sibling placement was concerned, the Department indicated that the minors had been raised together in the same home, had shared common experiences, and had existing and close bonds. They expressed a desire to live together, but if that were

---

[4] We note an inconsistency between Mother's statement here that she had had no contact with G.N. since 2005, and a reference by the Department earlier in its report that there had been a referral on March 8, 2012, of alleged physical and verbal abuse of E.N. by G.N.

15

not possible, they wanted to continue visiting each other. Maintaining the sibling relationship was deemed to be in the minors' best interests.

### F. Visitation

The court had previously ordered supervised visitation of the minors by Mother a minimum of two times per week. The social worker was given discretion to adjust the frequency and duration of visitation, as well as supervision. There had been no concerns expressed with Mother's visitation of E.N. and N.L. But I.P. participated in only one visit with Mother, and she told her foster parent afterward "that the visit 'felt awkward.' "

The court had previously ordered that Father have supervised visitation of N.L. at least once a week in a therapeutic setting, with the social worker having discretion to adjust the frequency, duration, and supervision of visitation. No such visits had occurred as of the time of the Department's report.

### G. Recommendations

The Department recommended that Mother be offered family reunification services as to the three minors and that J.L. be offered reunification services as to N.L. In doing so, the Department noted that it had provided family maintenance services on two separate occasions. It said: "The Department is concerned that despite the amount of services the family has received in the past, the parents continue to use physical discipline with their children and sadly [J.L.] has now moved on to be sexually inappropriate with [I.P. M]other denies that she hits her children and claims she was not aware that [J.L.] was using physical discipline." With respect to the alleged sexual abuse, the Department indicated that "[M]other was aware that [J.L.] wanted to sleep [in the same bed as I.P.] but continued to let it happen. The Department has grave concerns of [M]other's ambivalence about whether she believes [I.P.'s] disclosure."

### H. Supplemental Report

In a supplemental report filed January 28, 2015, the Department indicated that it was recommending that Mother obtain a psychological evaluation to properly assess the

type of services that would be most beneficial to her. It noted that Mother had received a total of 48 months of services in the prior dependency proceedings, and that prior to the conclusion of the second proceeding, Mother had agreed that any visits by J.L. with N.L. would not occur in the home. The minors advised the Department that, although Mother had initially complied by not allowing J.L. to return to the home—and "[the minors] trusted and believed that [M]other had made behavioral changes to ensure their safety"— "shortly thereafter [M]other allowed [J.L.] to return to the family home." The Department noted that "[c]learly, [M]other's extensive participation [in] previous services and the total amount of time the Department has been involved with the family in the past does [*sic*] not appear to have been sufficient to enable her to keep her children safe. The Department feels that [M]other's services must be individually tailored to assist her in making effective behavioral changes to protect her children."

### III.   *Jurisdictional/Dispositional Hearing*

#### A.   Evidence

At the outset of the contested hearing, the Department reiterated that it was recommending reunification services for Mother as to the three minors and for J.L. as to his daughter, N.L. The minors' counsel objected to providing services to Mother or J.L., claiming that services should be bypassed pursuant to section 361.5, subdivisions (b)(3) and (b)(6). When the matter had initially come on for hearing the previous month, minors' counsel had also objected to Mother and J.L. receiving services. J.L.'s counsel indicated that services should not be bypassed, but otherwise stated that—based upon consultation with her client and his attorney in the pending criminal proceedings—she did not intend to question any witnesses or call J.L. to testify.

The Department submitted into evidence its December 16, 2014 report and its supplemental report. Mother introduced into evidence Parent Center reports concerning Mother's participation in counseling.

17

The minors' counsel called Social Worker Jacquelyn de Santos as a witness. De Santos testified that she was the author of the Department's report and supplemental report. She acknowledged that the Department had recommended that Mother submit to a psychological evaluation so services could be specifically tailored to her. De Santos confirmed that Mother had previously received 48 months of services that had included individual counseling, domestic violence counseling and parenting classes. She also confirmed that the service plans for the two prior dependencies were essentially the same. After J.L. was released from incarceration, he received the same services in the second dependency proceeding. The minors were not removed from Mother's care in the two prior proceedings. Mother successfully completed the case plans in the prior dependencies and they were dismissed. But de Santos later testified that she would not consider the second dependency to have been successfully completed, if, five months after the case was dismissed, I.P. had reported that Mother was throwing things and hitting her again.

De Santos testified that Mother had been participating in her current case plan. She had been visiting with E.N. and N.L. twice per week, and the visitation supervisor had indicated there were no concerns from the visits. But it had been reported to de Santos that Mother had favored N.L. in the visits. Mother was also available for visitation with I.P.

Mother also testified at the hearing. She testified that she had not thrown any objects at the minors since the dismissal of the second proceeding. She also testified that she disciplined the minors through time-outs. She had been participating in her case plan through counseling and attending parenting classes. The parenting classes she attended were focusing on parenting teenagers. She had visited twice with I.P. and wanted further visits with her. But I.P. had said that she did not want to visit Mother, and I.P.'s counselor had indicated that I.P. was not yet ready for visits. Mother testified that she wanted to reunify with her children.

18

On cross-examination, Mother testified that if I.P. had said in January 2014 that Mother had thrown a shoe at her and had struck her, I.P. would have been untruthful. In the approximate 10 parenting classes Mother had attended in the second dependency proceeding, she learned about parenting teens.

The court marked for identification and introduced as a court exhibit the final judgment in the second dependency proceeding entered on August 12, 2013. That judgment included an order concerning visitation of N.L. by her father, J.L., with language as follows: "The father's visits shall not occur in the mother's residence."

B.     Decision

After argument, on January 30, 2015, the court orally announced its findings and conclusions (discussed in detail, *post*). It concluded that J.L. had touched I.P.'s vagina with his hand and almost penetrated her, and that this conduct was severe sexual assault under section 361.5(b)(6). The court also concluded that Mother had given her implied consent to J.L.'s sexual assault of I.P. within the meaning that statute. And it found by clear and convincing evidence that the minors would not benefit from reunification services. The court ordered that Mother's visitation of the minors and J.L.'s visitation of N.L. be "tapered from [the] current level[s]" to once a month. The court also ordered that the permanency hearing be set for May 19, 2015. Finally, the court ordered the matter continued to February 3, 2015, for entry of formal orders.

At the hearing on February 3, 2015, the court entered formal orders in the three proceedings. The court, among other things, sustained the allegations of each petition; adopted the findings as recited in the written orders; determined that reunification services should not be provided to Mother as to the minors and should not be provided to J.L. as to N.L.; based this bypass order on the finding by clear and convincing evidence, pursuant to section 361.5(b)(6), that the minors were adjudicated dependents pursuant to subdivisions (a), (b), and (d) of section 300 as a result of severe sexual abuse of I.P. by J.L. with Mother's implied consent to such severe sexual abuse; found that it was not in

19

the minors' best interests that reunification services be offered or provided; and set permanency hearings for May 19, 2015.

IV.     *Petition for Writ of Mandate*

Mother and J.L. timely filed separate notices of intent to file writ petitions to review the order bypassing services and setting a hearing under section 366.26. These notices were filed under rule 8.450(e) of the California Rules of Court.[5] Thereafter, Mother and J.L. filed their respective petitions for writ of mandate with this court. (See rule 8.452.) Mother and J.L. also sought a stay of the permanency hearings set for May 19, 2015.

## DISCUSSION

I.     *Applicable Legal Principles*

A.     *Dependency Law Generally*

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare. [Citations.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) As our high court has explained: "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time. [Citations.] Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.] The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with

_____

[5] All rule references hereafter are to the California Rules of Court.

20

their parents have been unsuccessful.  [Citations.]  This interest is a compelling one.  [Citation.]"  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

The court at a jurisdictional hearing must first determine whether the child, by a preponderance of the evidence, is a person described under section 300 as coming within the court's jurisdiction.  (§ 355, subd. (a).)  Once such a finding has been made, the court at a dispositional hearing must hear evidence to decide the child's disposition, i.e., whether he or she will remain in, or be removed from, the home, and the nature and extent of any limitations that will be placed upon the parents' control over the child, including educational or developmental decisions.  (§ 361, subd. (a).)  If at the dispositional hearing, the court determines that removal of the child from the custody of the parent or guardian is appropriate, such removal order must be based upon clear and convincing evidence establishing that one of five statutory circumstances exists.  (§ 361, subd. (c).)  One such circumstance is the existence of substantial danger to the child's "physical health, safety, protection, or physical or emotional well-being" if he or she were returned to the home.  (§ 361, subd. (c)(1).)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the permanency hearing as provided under section 366.26.  The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children."  (§ 366.26, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)

B.      *Family Reunification Services*

When a dependent child is removed from parental custody, the juvenile court is ordinarily required to provide the parent with services to facilitate the reunification of the family.  (§ 361.5, subd. (a); see *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 303.)  Where reunification services are ordered, they generally (subject to exceptions and instances in which the period may be extended) begin with the dispositional hearing and, for children three years or older, end 12 months thereafter.  (§ 361.5, subd. (a)(1)(A).)

21

Although a parent may reasonably expect under most circumstances to receive reunification services for at least the periods designated under section 361.5, subdivision (a)(1), there is no entitlement to services for a prescribed minimum period. (*In re Derrick S.* (2007) 156 Cal.App.4th 436, 445-450; *In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242-1243.) Thus, "the juvenile court has the discretion to terminate the reunification services of a parent at any time after it has ordered them, depending on the circumstances presented." (*In re Aryanna C.*, at p. 1242.)

Reunification services are very significant, but parents have no absolute right to receive them. As explained by one court: "The importance of reunification services in the dependency system cannot be gainsaid. The law favors reunification whenever possible. [Citation.] To achieve that goal, ordinarily a parent must be granted reasonable reunification services. [Citation.] But reunification services constitute a benefit; there is no constitutional ' "entitlement" ' to those services. [Citation.]" (*In re Aryanna C.*, *supra*, 132 Cal.App.4th at p. 1242.)

A court may order the bypass of reunification services altogether if one of sixteen circumstances is established by clear and convincing evidence, as specified in subdivision (b) of section 361.5. These exceptions "have been referred to as reunification 'bypass' provisions." (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 845 (*Tyrone W.*).) One such circumstance is where the court finds that "[t]hat the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5(b)(6).) "These bypass provisions represent the Legislature's recognition that it may be fruitless to provide reunification services under certain circumstances. [Citation.]" (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 597; see also *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 [if

one of the exceptions under subdivision (b) applies, "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources"].)

In most of the sixteen circumstances identified in subdivision (b)—including subdivision (b)(6)—even if the court finds the circumstance to apply, it may order reunification services if it finds by clear and convincing evidence that services are in the child's best interest. (§ 361.5, subd. (c); see *In re Ethan C.* (2012) 54 Cal.4th 610, 626.) "A court called upon to determine whether reunification would be in the child's best interest may consider a parent's current efforts and fitness as well as the parent's history. [Citation.] Additional factors for the juvenile court to consider when determining whether a child's best interest will be served by pursuing reunification include: the gravity of the problem that led to the dependency; the strength of the relative bonds between the child and both the parent and caretakers; and the child's need for stability and continuity, which is of paramount concern. [Citations.] The burden is on the parent to show that reunification would serve the best interests of the child. [Citations.]" (*In re S.B.* (2013) 222 Cal.App.4th 612, 622-623; see also *In re Ethan N.* (2004) 122 Cal.App.4th 55, 66-68.)

C.      *Standard of Review*

We review an order bypassing reunification services to determine whether there is substantial evidence to support the court's findings. (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 843.) "In so doing, we presume 'in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' [Citation.]" (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1163-1164) Our role is not to reweigh the evidence or to make credibility determinations. (*A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242.) But questions of statutory interpretation are independently reviewed. (*Ibid.*) And " ' "[t]he sufficiency of evidence to establish a

23

given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.]" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, quoting *Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)

However, where the court finds by clear and convincing evidence that one of the bypass provisions of subdivision (b) applies, and the court does not find by clear and convincing evidence under subdivision (c) that reunification services are in the child's best interest, we review the latter determination for abuse of discretion. "A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.]" (*In re William B.* (2008) 163 Cal.App.4th 1220, 1229.)

II.     *Order Bypassing Reunification Services*

A.     Arguments of the Parties

Mother challenges the dispositional Order bypassing reunification services. She contends the court's decision "is unsupported by the facts" and is "the result of a misapplication of the law." First, she argues there was insufficient evidence to support the court's finding that I.P. had been subjected to "serious sexual abuse" within the meaning of section 361.5(b)(6). Second, she asserts that even if serious sexual abuse had occurred, there was no basis for bypassing services for her because she had no knowledge of the abuse. She contends there was no basis for the court's finding that she had given her implied consent to J.L.'s sexual abuse of I.P., and that "absent unusual facts," the denial of services under section 361.5(b)(6) is upheld only as against the parent or guardian who had perpetrated the abuse.

J.L. argues the court abused its discretion in issuing the Order. He asserts that because review in this instance involves a question of law, we should review the court's determination de novo. J.L. argues in the alternative that even if we were to apply an

24

abuse of discretion standard, he should prevail, because the alleged conduct did not constitute "severe sexual abuse" under section 361.5(b)(6).

Mother states in her petition that "[t]he *primary* issue in this writ proceeding is the actions by the trial court in refusing to allow for reunification services." (Italics added.) Neither Mother nor J.L. asserts any challenge to the Order *other than* the denial of reunification services. Accordingly, we deem abandoned any unasserted claims of error with respect to the Order. (See *In re Phoenix H.* (2009) 47 Cal.4th 835, 845; *T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12.)

In the two responses filed on the minors' behalf, counsel requests that the Order be upheld. Counsel asserts there was substantial evidence supporting the court's finding that J.L.'s conduct constituted severe sexual abuse justifying the bypass orders. Minors' counsel contends further that there was substantial evidence that supported the court's conclusion that Mother impliedly consented to the severe sexual abuse perpetrated by J.L.

The Department argues in its response that while the conduct as alleged by I.P. would constitute sexual abuse, it was error for the court to find that it was "severe sexual abuse" under section 361.5(b)(6). And it contends there was insufficient evidence from which the court could find that Mother impliedly consented to J.L.'s sexual abuse of I.P.

B.     Severe Sexual Abuse Finding

Under section 361.5(b)(6),[6] the court may issue a bypass order if it finds by clear and convincing evidence that a dependent child has been so adjudicated "as a result of

_____

[6] "(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . .[¶] . . .[¶] (6) That the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian. [¶] A finding of severe sexual abuse, for the purposes of this subdivision, may be based on, but is not limited to, sexual intercourse, or stimulation involving genital-

Continued

25

severe sexual abuse . . . to the child, a sibling, or a half sibling by a parent or guardian, . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." The term "severe sexual abuse" in the statute "is defined very broadly." (Cal. Juvenile Dependency Practice (Cont.Ed.Bar 1st ed. 2015) § 5.57, p. 370.) The court's finding of severe sexual abuse under section 361.5(b)(6) "may be based on, *but is not limited to*, sexual intercourse, or stimulation involving genital-genital, oral-genital, anal-genital, or oral-anal contact, . . . ; or the penetration or manipulation of the child's, sibling's, or half sibling's genital organs or rectum by any animate or inanimate object for the sexual gratification of the parent or guardian, or for the sexual gratification of another person with the actual or implied consent of the parent or guardian." (Italics added; see also *In re Y.M.* (2012) 207 Cal.App.4th 892, 917-918.)

Here, there was evidence, credited by the trial court, that on October 17, 2014, while I.P. was sleeping on the couch in the living room, J.L. lay down beside her; held her for about five minutes while she pretended to be asleep; put his hands under her shirt and under her bra; grabbed her breast " 'really hard' "; and "put his hand under her shorts and touched her rear area and her vagina." I.P. stated that she felt he would have

genital, oral-genital, anal-genital, or oral-anal contact, whether between the parent or guardian and the child or a sibling or half sibling of the child, or between the child or a sibling or half sibling of the child and another person or animal with the actual or implied consent of the parent or guardian; or the penetration or manipulation of the child's, sibling's, or half sibling's genital organs or rectum by any animate or inanimate object for the sexual gratification of the parent or guardian, or for the sexual gratification of another person with the actual or implied consent of the parent or guardian. [¶] A finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body or the body of a sibling or half sibling of the child by an act or omission of the parent or guardian, or of another individual or animal with the consent of the parent or guardian; deliberate and torturous confinement of the child, sibling, or half sibling in a closed space; or any other torturous act or omission that would be reasonably understood to cause serious emotional damage." (§ 361.5(b)(6).)

26

penetrated her vagina had she not moved. J.L. "finally stopped because [I.P.] was struggling and crying." I.P stated the incident lasted a total of 10 to 20 minutes. I.P.'s arm was scratched and her breast was sore as a result of J.L.'s assault. This constituted substantial evidence of severe sexual abuse.

J.L. argues that the conduct described by I.P. did not constitute severe sexual abuse because—as indicated in Detective Pursley's report—J.L.'s "hand was only on her vagina for a brief second" and his hand was on I.P.'s breast for approximately three minutes. If the statute defined "severe sexual abuse" narrowly as including only the acts therein specified, J.L.'s argument might have some traction. For while J.L.'s alleged conduct of briefly placing his hand on top of I.P.'s vagina may not fall squarely within the statute's reference to "manipulation of the child's . . . genital organs," section 361.5(b)(6) provides that a court's finding of severe sexual abuse "may be based on, *but is not limited to*," the specified acts set forth therein. (Italics added.)

Here, J.L.'s action of having his hand come into direct contact with I.P's vagina—occurring at the end of an encounter lasting as long as 20 minutes—was preceded by J.L.'s (1) lying down beside I.P. and holding her for approximately five minutes; (2) placing his hand under her shirt and bra and grabbing her breast firmly for approximately three minutes; and (3) placing his hand under I.P.'s shorts and underwear to make contact with her buttocks and vagina. And, according to I.P.'s account, which the court credited, I.P. cried and struggled to get away from J.L. during the encounter, and she felt he would have penetrated her vagina with his fingers had she not moved away from him. Under these circumstances, and contrary to the assertions of Mother and J.L., the court did not misapply section 361.5(b)(6) by finding J.L.'s conduct to have constituted severe sexual abuse.

### C. Implied Consent

Pursuant to section 361.5(b)(6), a finding of severe sexual abuse serving as a basis for a bypass order may be based upon, among other things, severe sexual abuse upon the

27

minor or the minor's sibling or half-sibling inflicted "by another person" "for [his or her] sexual gratification" "with the actual or implied consent of the parent or guardian." Thus, if the severe sexual abuse is committed by someone other than a parent or guardian— here, J.L.—and the parent or guardian gives his or her actual or implied consent to the conduct, a bypass order may be entered against that parent or guardian even though he or she did not directly perpetrate the abuse.

In this instance, the court based its Order as to Mother upon the conclusion that she had impliedly consented to the severe sexual abuse of I.P. by J.L. The court announced on the record detailed factual findings in support of this conclusion. These findings included that (1) notwithstanding that the custody order entered at the conclusion of the second dependency proceeding specified that J.L.'s visits of N.L. were not to occur at Mother's residence, Mother thereafter invited J.L. into her residence and allowed him to be there with her three children; (2) J.L. provided Mother with evening and nighttime childcare supervision, and he sometimes spent the night; (3) J.L. conditioned his being in the home at night to supervise the children upon being permitted to sleep in the same bed as the two girls, I.P. and N.L.; (4) J.L., in response to Mother's questioning him about the arrangement, told her that as long as he was around, he was going to sleep with I.P. and N.L.; (5) J.L. in fact slept between I.P. and N.L. with Mother's consent; (6) at the same time, Mother also knew that J.L. "had an extraordinarily detailed knowledge of [I.P.'s] feminine health issues including the exact date of her first menstrual cycle[, t]he regularity of her menstrual cycles[,] and when her menstrual period was late"; (7) J.L. knew that I.P. was sexually active and had engaged in sexual intercourse; (8) J.L. knew of I.P.'s use of tampons, which he purchased for her; (9) Mother knew that J.L. had bought a pregnancy test kit for I.P. and had given her specific instructions on its use; (10) Mother knew that J.L. had bought undergarments for I.P. from Victoria's Secret, "a company commonly associated with sexually provocative women's clothing"; (11) Mother observed J.L. engage in activity that I.P. identified "as cuddling in which

28

[I.P.] described more particularly as [J.L.] holding her closely with one hand underneath her and one hand on top of her[, which] . . . occurred in the daytime and at night and in bed with [M]other in the same room"; (12) at the time of the alleged sexual abuse, Mother had already received 48 months of services and J.L. had received approximately 40 months of services; and (13) both Mother and J.L. had received extensive individual and group counseling and classes addressing parenting of teenagers.

The court found further that, "given the training [M]other had received, the information that [M]other had regarding J.L.'s inappropriate physical contact with [I.P.,] and the fact that [M[other knew [J.L.] had [an] inappropriate level of knowledge of and involvement with [I.P.'s] feminine maturation and sexual development and pregnancy testing[,] and [M]other's knowledge that [J.L.] was purchasing undergarments [for] the 15 year old girl that he was insisting upon sleeping with, [M]other impliedly consented to the sexual assault of [I.P.] within the meaning of" section 361.5(b)(6). The court concluded that Mother's conduct "indicate[d] that she offered [I.P.] to [J.L.] in return for childcare supervision of [I.P., E.N., and N.L.] and placed [I.P.] under [J.L.'s] control for sexual exploitation."

The court's conclusion that Mother gave her implied consent to J.L.'s sexual abuse of I.P. was supported by substantial evidence—namely, the evidence the court recited on the record. Contrary to Mother's claim that "there [was] not the slightest showing that she was aware of the molestation or that she consented to the acts," there was significant evidence from which the court could have reasonably concluded that Mother impliedly consented to J.L.'s conduct. As noted by the court, Mother was aware of J.L.'s peculiar and inappropriate level of knowledge of I.P.'s sexual maturation. As she explained to Social Worker Long, Mother herself was concerned about J.L.'s close relationship with I.P. and found it "odd" that he had bought I.P. undergarments from Victoria's Secret. And perhaps most significantly, Mother told Long she was uncomfortable with I.P. and J.L. sleeping in the same bed, and she had explored this issue with J.L., who told her

29

"that as long as he was around he was going to continue sleeping with them." These facts and others recited by the trial court—coupled with evidence that Mother had previously received 48 months of services, including parenting classes in which presumably one of the paramount teaching points was the obligation to keep children safe—are substantial evidence that Mother impliedly consented to J.L.'s sexual abuse of I.P. Contrary to Mother's contention that she was at most merely negligent, the evidence, giving deference to the trial court's conclusions, showed that Mother turned a blind eye toward J.L.'s sexual interest in I.P., presumably because she desired his childcare services.

Mother, citing *In re Kenneth M.* (2004) 123 Cal.App.4th 16, argues that "absent unusual facts," a bypass order under section 361.5(b)(6) is generally "upheld only as against the perpetrator of the act of severe sexual abuse." In *In re Kenneth M.*, the mother of two children appealed an order terminating her parental rights, claiming the court erred by denying her reunification services and by failing to ensure that the notice requirements under the Indian Child Welfare Act (ICWA) were satisfied. (*In re Kenneth M.*, at p. 18.) One of the children had suffered head and eye injuries, and the agency alleged that the abuse was " 'likely by one of her parents or possibly by someone they left [the child] in the care of.' " (*Id.* at p. 19.) The mother argued the trial court erred in denying reunification services under subdivisions (b)(5) and (b)(6) of section 361.5, because it did not determine that she was the person who had caused the child's injuries. (*Id.* at p. 20.) The appellate court held that denying reunification services under section 361.5(b)(6) requires that the juvenile court identify the perpetrator of the abuse, noting that "[b]y its express terms, subdivision (b)(6) applies to the parent who inflicted severe physical harm to the minor." (*In re Kenneth M.*, at p. 21.) But the court went on to hold the denial of reunification services was proper under subdivision (b)(5) of section 361.5 as to the abused child and under subdivision (b)(7) of section 361.5 as to the abused child's sibling. (*In re Kenneth M.*, at p. 22.)

30

*In re Kenneth M.* did not concern a bypass order under section 361.5(b)(6) based upon severe sexual abuse of a child. Nor did it involve a contention that a bypass order was appropriate because a parent had impliedly consented to the perpetration of severe sexual abuse upon his or her child. Moreover, we do not read *In re Kenneth M.* as holding that a bypass order may be made pursuant to section 361.5(b)(6) only as against the parent who directly perpetrates the physical (or in this case, severe sexual) abuse. As explained by the Fourth District Court of Appeal: "[W]e agree with the *Kenneth M.* court that section 361.5, subdivision (b)(6) applies to the actual perpetrator of the abuse, and also note that *Kenneth M.* did *not* restrict the application of subdivision (b)(6) to the actual abuser. In other words, *Kenneth M.* does not support mother's contention that she was not an offending parent within the meaning of subdivision (b)(6) simply because she was not the perpetrator." (*Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 562 (*Amber K.*), original italics.) *In re Kenneth M.* does not support Mother's position that the court erred.

Mother also cites *Amber K.* in arguing that the court's finding of implied consent was error. There, the appellate court found that substantial evidence supported the juvenile court's finding under section 361.5(b)(6) that the mother had "by her actions, impliedly consented to the sexual abuse" of her daughter (S.M.) by the father. (*Amber K.*, *supra*, 146 Cal.App.4th at p. 561.) There was evidence that the father had previously sexually abused another child (D.L.), and that that child had informed the mother of the abuse on multiple occasions. (*Id.* at p. 560.) The sexual abuse of S.M. occurred when the mother allowed the father to stay at their house for a few nights. Because the mother had allowed the father access to S.M., knowing of his prior sexual abuse of another child, the court held that she "was an offending parent, within the meaning of section 361.5, subdivision (b)(6)" (*id.* at p. 561), that is, "a parent who gave actual or implied consent to the sexual abuse of the child by another person" (*ibid.*).

31

*Amber K.* does not stand for the proposition that, under section 361.5(b)(6), in order to find that a parent impliedly consented to the severe sexual abuse of a child by another, the parent must have had actual knowledge that the person had previously sexually abused that child or another child. Thus, while the circumstances in *Amber K.* involved actual consent, that case does not negate the existence of substantial evidence here that Mother impliedly consented to J.L.'s severe sexual abuse of I.P.

Lastly, Mother cites a case in which a bypass order was reversed, *Tyrone W.*, *supra*, 151 Cal.App.4th 839, as presenting circumstances analogous to those here. In *Tyrone W.*, the dependency proceeding commenced after the death of an infant in which the medical examiner originally suspected the cause of death as sudden infant death syndrome. After autopsy, however, the medical examiner concluded that the death was " 'suspicious.' " (*Id.* at p. 844.) (There had been a referral to child services a year earlier for injuries sustained by the parents' older child. (*Id.* at p. 843.)) After an expert concluded that rib injuries to the infant were likely to have been the result of abuse, the agency amended the petition to allege that the infant had suffered severe physical abuse inflicted nonaccidentally and there was a substantial risk the surviving sibling would suffer severe physical abuse by the parents pursuant to subdivisions (e) and (j) of section 300l. (*Tyrone W.*, at p. 845.) Based upon the agency's recommendation, the trial court denied reunification services under section 361.5(b)(6). (*Tyrone W.*, at p. 845.)

The appellate court in *Tyrone W.* concluded this was error, holding that the juvenile court could not bypass reunification services under the "severe physical harm" provision of subdivision (b)(6) based on a finding that a parent " 'reasonably should have known' [the infant] was being physically abused." (*Tyrone W.*, *supra*, 151 Cal.App.4th at p. 849.) The court noted the Legislature had included the words " 'deliberate' and 'inflicted' " in the "severe physical harm" provision of section 361.5(b)(6), but not the phrase " 'reasonably should have known.' " (*Tyrone W.*, at p. 850.) Considering this statutory language, the court concluded that section 361.5(b)(6) "applies to the parent or

parents who inflicted severe physical harm to the child whether by act, omission or consent, and does not apply to a negligent parent." (*Id.* at p. 851.) But the court in *Tyrone W.* ultimately upheld the denial of reunification services on the ground that the sustained allegations under section 300, subdivision (j) showed more than negligence. (*Tyrone W.*, at p. 854.)

Our case concerns "severe sexual abuse" under section 361.5(b)(6), not the issue of "severe physical harm" considered in *Tyrone W.* But even assuming—based upon an extrapolation of the holding in *Tyrone W.*—that a parent's negligence in permitting the severe sexual abuse of a child is insufficient for a bypass order under section 361.5(b)(6), here, as discussed above, there was substantial evidence to support a finding that Mother was not merely negligent, but that she impliedly consented to the sexual abuse.

D.      Best Interests of the Minors

As indicated above, if the court concludes that section 361.5(b)(6) applies, it "shall not order reunification . . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c).) The court below concluded it was not in the minors' best interest that reunification services be offered or provided. Neither Mother nor J.L. have specifically challenged this conclusion in their respective writ petitions. They have therefore abandoned any such challenge. (*In re Phoenix H.*, *supra*, 47 Cal.4th at p. 845; *T.P. v. T.W.*, *supra*, 191 Cal.App.4th at p. 1440, fn. 12.) The Department in its response to the petitions briefly argues that the court erred in finding that offering or providing services were not in the minors' best interest. We will therefore address the question.

"The concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citation.]" (*In re Ethan N.*, *supra*, 122 Cal.App.4th at p. 66.) In making a "best interest" finding, factors the court should consider are the parent's current efforts and fitness; the parents' history; the gravity of the problem leading to the

33

dependency; the strength of the bonds between parents and the children; and the need for stability of the children. (*In re S.B., supra*, 222 Cal.App.4th at pp. 622-623.)

Here, there was evidence that Mother had attended parenting classes and been active in visiting E.N. and N.L. Mother's visitation of I.P. was limited, due to I.P.'s lack of interest in pursuing visitation. There was no evidence of J.L's participation in his case plan, and there was no evidence he had engaged in visitation with N.L. Further, as to the issue of current fitness—and the interrelated issue of the gravity of the problem that resulted in the dependencies—the sexual abuse of I.P. by J.L., along with Mother's implied consent to the conduct, cannot be understated. Nor can it be overlooked that the additional reason for the dependencies was the reported physical abuse of I.P. by J.L., and that at the time, there was a pending investigation of alleged physical abuse of E.N. by both Mother and J.L. Additionally, the family had an extensive history with protective services dating back to 2006, including a history of domestic violence and physical abuse of the minors. And, as emphasized by the court in its order, Mother and J.L. had already received approximately 48 months and 40 months of services, respectively, causing the Department to recommend that the court order Mother to participate in a psychological evaluation.

It was the burden of Mother and J.L. to establish that reunification would serve the minors' best interests. (*In re S.B.*, *supra*, 222 Cal.App.4th at p. 623.) Based upon the record before us, the court did not abuse its discretion in concluding that providing reunification services to Mother and J.L. would not be in the minors' best interests. (*In re William B.*, *supra*, 163 Cal.App.4th at p. 1229.)

## DISPOSITION

The petitions for writ of mandate are denied. Because we have concluded that the petitions are not meritorious, petitioners' respective requests for a stay of the .26 hearing are denied.

_____
                                                     Márquez, J.

WE CONCUR:

_____
  Rushing, P.J.

_____
  Grover, J.